WISCONSIN CENTRAL FARMS, INC.,
Plaintiff-Appellant-Cross-Respondent,

v.

HEARTLAND AGRICULTURAL MARKETING, INC.,
Defendant-Respondent-Cross-Appellant.

Court of Appeals

*No. 2004AP2971. Oral argument March 13, 2006.
—Decided September 28, 2006.*

2006 WI App 199

(Also reported in 724 N.W.2d 364.)

783

On behalf of the plaintiff-appellant-cross-respondent, the cause was submitted on the briefs of and oral argument by *William T. Curran* of *Curran, Hollenbeck & Orton, S.C.*, Mauston.

On behalf of the defendant-respondent-cross-appellant, the cause was submitted on the briefs of and oral argument by *Mark S. Henkel* of *First Law Group, S.C.*, Stevens Point.

Before Lundsten, P.J., Deininger and Higginbotham, JJ.

¶ 1. LUNDSTEN, P.J. This case arises from a contract dispute between Wisconsin Central Farms and Heartland Agricultural Marketing. Under the contract, Heartland agreed to receive potatoes from Central Farms, sell them to potato chip plants, and pay Central Farms the contract price as the potatoes were delivered to third parties. In a special verdict following trial, the jury found that Heartland breached the contract, and awarded damages to Central Farms. The jury also made findings under Wis. Stat. ch. 100 (1999–2000),[1] a chapter that regulates some aspects of agricultural marketing and trade practices. The circuit court denied post-verdict requests by Central Farms for double damages and attorney's fees under ch. 100.

¶ 2. Central Farms appeals the denial of double damages and attorney fees. It also appeals an order staying execution of the judgment and tolling 12% statutory interest on the judgment damages while this appeal is pending. Heartland cross-appeals, arguing, among other things, that we should grant a new trial based on alleged trial errors and in the interest of justice.

¶ 3. We agree with Central Farms that it is entitled to double damages. In all other respects, we affirm the circuit court's judgment. We also affirm the circuit court's order staying execution of the judgment.

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

## *Background*

¶ 4. Under the parties' contract, Central Farms agreed to deliver 72,000 hundredweight of potatoes to Heartland by October 10, 2000.[2] The contract was for Snowden "chipping" potatoes, that is, potatoes used to make potato chip products. Heartland agreed to store the potatoes and market them to third parties. The contract provided that Heartland would pay Central Farms $6.65 per hundredweight, reduced by charges for storing, managing, testing, loading out, and grading the potatoes. The contract also specified that the amount Heartland owed Central Farms would be determined on the basis of "marketable" potato quantities on the date the potatoes were accepted by the third parties.

¶ 5. After Central Farms delivered the potatoes, Heartland made a payment to Central Farms for a portion of the potatoes Heartland had delivered to a third party. Later, Heartland began sending truckloads of potatoes, including Central Farms' potatoes, to a third-party plant in Texas, but the plant rejected the potatoes. Heartland's attempts to market Central Farms' potatoes elsewhere were not successful. In February 2001, Heartland informed Central Farms that Heartland was rejecting Central Farms' potatoes.[3]

---

[2] A hundredweight is a hundred pounds. Thus, the contract was for 3,600 tons of potatoes.

[3] Although both parties speak in terms of Heartland rejecting "the potatoes," the record indicates that some potatoes may have been accepted by the third-party plant and some may have been marketed later. We focus however, as the parties do, on the potatoes that were not marketed and that Heartland rejected.

¶ 6. Central Farms sued Heartland, alleging breach of contract and a violation of Wɪs. Sᴛᴀᴛ. § 100.01.[4] The case proceeded to a jury trial. The special verdict included the following findings by the jury:

QUESTION 1: Did [Heartland] breach the contract with [Central Farms] for the 2000 potato harvest?

Yes

QUESTION 2: If you have answered question 1 "YES", then answer these questions:

(a) Was [Heartland]'s breach a breach of its duty of good faith and fair dealing in performing its contract with [Central Farms]?

No

(b) Did [Heartland] reject or fail to properly deliver the potatoes it contracted to buy from [Central Farms] without reasonable cause?

Yes

. . . .

QUESTION 3: Did [Central Farms] breach the contract with [Heartland] for the 2000 potato harvest?

No

. . . .

---

[4] Wɪsᴄᴏɴsɪɴ Sᴛᴀᴛ. § 100.01 provides, in part:

(2) Uɴꜰᴀɪʀ ᴄᴏɴᴅᴜᴄᴛ. It shall be unlawful:

(a) For a dealer to reject or fail to deliver in accordance with the contract, without reasonable cause, produce bought or sold or contracted to be bought or sold by such dealer.

QUESTION 4: What sum of money will fairly and reasonabl[y] compensate [Central Farms] for the breach of contract?

ANSWER: $202,101.13

Thus, the jury found that Heartland breached the contract and awarded Central Farms $202,101.13 in damages. Pertinent to the statutory questions here, the jury rejected Central Farms' assertion that Heartland breached its duty of good faith, but found that Heartland did "reject or fail to properly deliver" under the contract "without reasonable cause."

¶ 7. The parties filed post-verdict motions. Central Farms sought statutory double damages based on the jury's finding that Heartland violated WIS. STAT. § 100.01(2)(a) by rejecting the potatoes without reasonable cause. Double damages for a violation of § 100.01(2)(a) are available under § 100.01(4).[5] Central Farms also sought attorney's fees under WIS. STAT. § 100.03.[6] Heartland requested that the court change the jury's answer to verdict question 2(b), its finding that Heartland rejected or failed to deliver without

---

[5] WISCONSIN STAT. § 100.01(4) provides:

DOUBLE DAMAGES. A produce wholesaler who violates any provision of sub. (2) shall be liable to any person injured thereby for twice the amount of damages sustained in consequence of such violation . . . .

[6] WISCONSIN STAT. § 100.03(20) provides:

PRIVATE REMEDY. In addition to any other remedy, if a producer sustains a monetary loss as a result of a violation of this section by a contractor, including a failure by the contractor to pay a liability to a producer when due, the producer may bring an action and may recover the amount of the producer's proven damages, together with costs, including all reasonable attorney fees, notwithstanding s. 814.04(1).

reasonable cause. Heartland also requested a new trial based on alleged trial errors.

¶ 8. The circuit court determined that Central Farms was not entitled to double damages under WIS. STAT. § 100.01 and not entitled to costs and attorney's fees under WIS. STAT. § 100.03. The court also denied Heartland's requests to change the answer to special verdict question 2(b) and for a new trial. The court entered judgment on the jury's verdict for $202,101.13, plus costs. Upon motion by Heartland, the circuit court also ordered a stay of execution of the judgment pending appeal, provided that Heartland pay the full judgment to the clerk of court. We will reference additional facts as needed in our discussion below.

## Discussion

### A. Double Damages Under WIS. STAT. § 100.01(4)

¶ 9. A "dealer" who violates WIS. STAT. § 100.01(2)(a) is liable for double damages under § 100.01(4). Therefore, Central Farms' assertion that it is entitled to double damages hinges on resolving the parties' arguments regarding § 100.01(2)(a).

¶ 10. WISCONSIN STAT. § 100.01(2)(a) provides that it is a violation "[f]or a dealer to reject or fail to deliver in accordance with the contract, without reasonable cause, produce bought or sold or contracted to be bought or sold by such dealer." Thus, for Central Farms to be entitled to double damages based on a violation of § 100.01(2)(a), the record must show that:

(1) Heartland was a "dealer";

(2) Heartland was a party to a contract with Central Farms in which Heartland bought or sold or contracted to buy or sell produce; and

(3) Heartland, "without reasonable cause," "reject[ed] or fail[ed] to deliver [the produce] in accordance with the contract."

Central Farms argues that undisputed facts and the jury's verdict demonstrate that all three elements are present here. We agree.

¶ 11. Heartland does not seriously dispute the first two elements. "Dealer" is broadly defined in Wis. Stat. § 100.01(1)(c), and there is no doubt the circuit court correctly concluded that Heartland was a dealer under this definition.[7] Similarly, it is undisputed that Heartland had a contract with Central Farms by which Heartland bought or contracted to buy produce from Central Farms, thus satisfying the second element.[8]

¶ 12. The parties do dispute the third element, both in the context of Central Farms' appeal and in Heartland's cross-appeal. This dispute centers on whether the circuit court should have changed the jury's answer to verdict question 2(b). That question read: "Did [Heartland] reject or fail to properly deliver the potatoes it contracted to buy from [Central Farms] without reasonable cause?" The jury answered: "Yes." Central Farms argues that this "yes" answer, combined with the two undisputed elements discussed above, demonstrates that Heartland violated Wis. Stat.

---

[7] Wisconsin Stat. § 100.01(1)(c) provides:

"Dealer" means a person who for resale buys, sells, offers or exposes for sale, or has in his or her possession with intent to sell, any produce except that raised by him or her and that purchased by him or her exclusively for his or her own sale at retail.

[8] It is undisputed that the potatoes at issue here were "produce." Wisconsin Stat. § 100.01(1)(d) defines "produce" as "any kinds of fresh fruit or fresh vegetable, including potatoes and onions intended for planting."

§ 100.01(2)(a) and that, consequently, Central Farms is entitled to double damages under § 100.01(4). Heartland presents several arguments as to why the circuit court erred by refusing to change the jury's answer to "no." If the answer is changed to "no," Central Farms is not entitled to double damages. Although Central Farms is the appellant, we choose to structure our discussion around Heartland's arguments.

¶ 13. Heartland first argues that the jury's "yes" answer to verdict question 2(b)—did Heartland act "without reasonable cause"—is inconsistent with the jury's answer to verdict question 2(a), in which the jury found that Central Farms failed to prove that Heartland's‘ contract breach involved a breach of Heartland's "duty of good faith." Heartland contends that it cannot, with respect to contract performance, simultaneously act "without reasonable cause" and comply with its duty to act in "good faith."

¶ 14. Heartland's argument assumes that the absence of bad faith is the equivalent of "reasonable cause," as the latter term is used in WIS. STAT. § 100.01(2)(a). But Heartland provides no support for this assumption. Heartland does not analyze the legal meaning of "duty of good faith" and does not compare such a meaning with the legal meaning of "reasonable cause." Rather, Heartland merely asserts that the two terms cover the same concept. Because Heartland's argument on this topic is undeveloped, we address it no further.

¶ 15. Heartland next argues that the evidence does not support a finding that Heartland breached the contract in any manner, much less that it acted unreasonably. Heartland asserts that the contract terms gave

Heartland discretion to reject potatoes that were, *in Heartland's judgment,* non-conforming. Heartland relies on the following terms from the contract:

> SHIPMENT. ... Heartland shall have the right upon arrival, or while in storage, to inspect and to reject any and all potatoes which are in Heartland's sole judgment defective or non-conforming based upon the failure to meet Specifications, including but not limited to grade, size or chip color.

> WARRANTY. Seller warrants that the potatoes shipped under this Agreement are equal to or exceed the Specifications including but not limited to grade, size, color, etc. . . . .

> . . . .

> HEARTLAND'S RIGHT TO REJECT. All potatoes furnished will be subject to inspection and testing upon arrival. Heartland shall have the right, at its option, to reject and to be held harmless for such rejection, any part or all of the potatoes ordered herein and delivered to Heartland and to return the same at Seller's expense in any of the following instances: . . . (ii) should the potatoes not be as represented or warranted . . . .

These provisions, however, do not give Heartland an unfettered right to reject. Rather, they condition Heartland's right to reject on whether the potatoes meet the contract specifications for quality or otherwise fail to be "as represented or warranted."[9] It is undisputed that Heartland rejected the potatoes. Moreover,

---

[9] Heartland points out that the contract did not require payment to Central Farms until third-party acceptance of the potatoes. This is true, but the point Heartland is making is unclear. To the extent Heartland means to argue that it was entitled to reject the potatoes if they were ultimately rejected by third parties, such an argument merely repackages an argu-

792

Heartland acknowledges that the evidence shows it did not perform the tests required to grade the potatoes to the contract specification of 85% U.S. No. 1. And, Heartland does not explain why the potatoes were otherwise not "as represented or warranted." Thus, Heartland fails to demonstrate that the evidence does not support the jury's finding that it breached the contract.

¶ 16. Next, Heartland argues that the jury's answer to verdict question 2(b) cannot stand because the question was impermissibly confusing. According to Heartland, question 2(b) was confusing because it included the phrase "fail to properly deliver." Heartland asserts that this phrase confused the jury because it was undefined and because delivery was not a disputed issue. Heartland notes that, after the trial, the circuit court speculated that the jury thought this phrase referred to a failure on Heartland's part to deliver the

---

ment we reject in the text, that is, that WIS. STAT. § 100.01 does not apply to the "quasi brokerage" type of situation involved here. *See* ¶¶ 19–20, *infra.*

In addition, we observe that the argument that the contract entitled Heartland to reject potatoes so long as third parties ultimately rejected them seemingly renders other terms of the contract superfluous, including the clause that enumerates specific circumstances under which Heartland has the right to reject.

Finally, we note that WIS. STAT. § 100.01(3) provides:

> ACCEPTANCE IMPLIED. If any dealer fails to notify the seller of rejection within 24 hours after the dealer receives notice of arrival of the produce, the dealer will be deemed to have accepted it as being in accordance with the contract.

For reasons that are not apparent, the parties do not discuss the applicability of § 100.01(3) and, therefore, we do not address its application here.

potatoes to a third party. We reject Heartland's confusion argument. First, at bottom, the argument is an attack on the inclusion of the phrase "fail to properly deliver" in the special verdict question. Heartland, however, never objected to question 2(b) on this ground or otherwise apprised the circuit court of the "confusion" argument Heartland now advances. Therefore, Heartland did not preserve an objection to this aspect of question 2(b). *See* WIS. STAT. § 805.13(3) ("Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict."); *see also State v. Schumacher*, 144 Wis. 2d 388, 409, 424 N.W.2d 672 (1988) (citing and discussing § 805.13(3)). Second, there is no reason to think the jury was confused. The verdict question is in the disjunctive— reject *or* fail to deliver—and the parties' evidence and arguments were focused on whether Heartland properly *rejected* the potatoes. Central Farms never argued to the jury that it could find that Heartland acted unreasonably under a stand-alone fail-to-deliver theory.

■■■■■■

¶ 17. Heartland asserts that the trial evidence "demonstrated that the quality and the marketability of the potatoes was debatable," that there was "[a]bundant evidence" of "quality problems," and that the circuit court "found that the dispute was bona fide." If Heartland means to argue that the evidence was insufficient to support a "yes" answer to verdict question 2(b), then its argument is undeveloped and misapprehends the appropriate standard of review. When reviewing the sufficiency of the evidence supporting a jury verdict, we do not look to see whether there is abundant contrary

evidence or look to comments by the circuit court; we look to the evidence. "If there is credible evidence to support the jury verdict, it does not matter that it is contradicted or that the contradictory evidence is stronger and more convincing." *Upton v. Tatro*, 68 Wis. 2d 562, 570, 229 N.W.2d 691 (1975). Heartland does not demonstrate that there is insufficient evidence to support the jury's answer to verdict question 2(b).

¶ 18. Our analysis thus far constitutes our conclusion that if the contract between Heartland and Central Farms was subject to Wis. STAT. § 100.01, then the record shows that Heartland violated § 100.01(2)(a) and is, therefore, liable to Central Farms for double damages under § 100.01(4). We next turn our attention to Heartland's contention that § 100.01 does not apply to the particular parties and the contract in this case. Heartland's arguments in this regard require us to interpret § 100.01. The proper construction of a statute is a question of law, for our *de novo* review. *General Cas. Co. v. DOR*, 2002 WI App 248, ¶ 4, 258 Wis. 2d 196, 653 N.W.2d 513.

¶ 19. Heartland argues that Wis. STAT. § 100.01 does not apply because the statute does not contemplate a "quasi brokerage" situation like the one between Heartland and Central Farms. According to Heartland, to construe the statute as such would produce an absurd and unreasonable result because "it [would not be] possible to have a dispute about vegetables tried without the prospect of incurring potentially ruinous liability for multiple damages." We are not persuaded.

¶ 20. WISCONSIN STAT. § 100.01, both in its broad definition of "dealer" and in several other provisions, including the provision for double damages, shows that

795

the legislature sought to encompass more than simple buyer-seller transactions. The double damages provision applies to all "produce wholesalers," which includes not only "dealers" as broadly defined in the statute but also produce "brokers" and "commission merchants."[10] Wis. Stat. § 100.01(1)(e). Heartland makes no argument as to *why* the legislature's broad approach is absurd or unreasonable. Why is it unreasonable to hold an intermediary, such as Heartland, liable for double damages, but not unreasonable to penalize a traditional seller or buyer in that manner? If there is a good answer to this question, Heartland has not provided it.

¶ 21. Heartland's second proffered reason why Wis. Stat. § 100.01 does not apply is that Heartland contracted around the statute. Heartland relies on a limitation-of-liability clause in the parties' contract. The clause limits Heartland's liability to the "price allocable to the potatoes" and prohibits imposing "penalties, damages, costs or losses of any description" on Heartland.[11] If this clause is a successful attempt to contract around § 100.01, then Heartland is not liable for double damages.

---

[10] Wisconsin Stat. § 100.01(1) provides, in part:

 (a) "Broker" means a person engaged in negotiating sales or purchases of produce for or on behalf of the seller or the buyer.

 (b) "Commission merchant" means a person engaged in receiving produce for sale for or on behalf of another.

The parties do not address why Heartland is not a "broker" or a "commission merchant" under the statute. Thus, neither do we.

[11] The clause reads:

 LIMITATION OF HEARTLAND'S LIABILITY. In no event shall Heartland be liable for anticipated profits or incidental or consequential damages. Heartland's liability on any claim of any

¶ 22. Heartland points out that WIS. STAT. § 100.01 contains no provision expressly prohibiting parties from contracting around the statute. By way of comparison, Heartland directs us to WIS. STAT. § 100.202, which renders contracts "void" if they violate WIS. STAT. § 100.201, a statute regulating dairy industry practices.[12] Heartland thus argues that the legislature's failure to enact a provision analogous to § 100.202 which applies to § 100.01 indicates that the legislature intended to allow parties to contract around § 100.01. We disagree.[13]

■

¶ 23. While it is true that when interpreting a statute we may consult surrounding statutes to aid in our interpretation, *see State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110, our primary focus is on the meaning of the language of the statute in question, *id.*,

kind for any loss or damage arising out of or in connection with or resulting from this Agreement or from the performance or breach hereof shall in no case exceed the price allocable to the potatoes which gives rise to the claim. Heartland shall not be liable for penalties, damages, costs or losses of any description. Any action resulting from any breach on the part of Heartland as to the potatoes or services delivered hereunder must be commenced within one (1) year after the cause of action has accrued.

[12] The full text of WIS. STAT. § 100.202 reads: "All contracts and agreements made in violation of s. 100.201 are void."

[13] Heartland relies on *Borden Co. v. McDowell*, 8 Wis. 2d 246, 99 N.W.2d 146 (1959), in making its statutory construction argument based on WIS. STAT. § 100.202. The *Borden* case, however, does not assist us. The issue in *Borden* was the constitutionality of WIS. STAT. §§ 100.201 and 100.202, which the *Borden* court upheld. *See Borden*, 8 Wis. 2d at 249–53, 263. The *Borden* court did not engage in any separate discussion of § 100.202 or the relationship of § 100.202 to other provisions in WIS. STAT. ch. 100.

¶ 45 (statutory interpretation " 'begins with the language of the statute' " (citation omitted)). We will not render an unreasonable or illogical interpretation of one statute based on nothing more than what another statute might reasonably be read to imply.

¶ 24. Focusing on the language of Wis. Stat. § 100.01, it defies common sense to think that the legislature intended to allow parties to contract around the double damages provision in § 100.01(4). The double damages provision in § 100.01(4) works in tandem with the provisions in § 100.01(2) defining unfair conduct. Indeed, the double damages provision in sub. (4) of the statute is the sole incentive to private parties to initiate actions to enforce the statute. Stated differently, without the double damages penalty, § 100.01 has no teeth.

¶ 25. Further, Wis. Stat. § 100.01 was enacted to protect growers and producers, consistent with the public interest. The supreme court discussed the purpose of a predecessor statute, when addressing that statute's constitutionality, in *State ex rel. Hickey v. Levitan*, 190 Wis. 646, 651–53, 670, 210 N.W. 111 (1926). The discussion in *Levitan* supports our conclusion here:

> The statute was enacted under the police power of the state, and was inspired on the part of the lawmaking body to prevent certain abuses which either had arisen and prevailed in the business, or which were likely to arise because of certain alleged peculiarities existing in the business . . . .
>
> . . . .
>
> The wholesale produce business does not touch the public interests to the same extent as does that of a

798

public utility, but that it is charged with a public interest cannot be denied . . . .

. . . .

. . . Large consignments are sold and resold by mere samples. So that it becomes apparent that vast opportunities are afforded for irregular, unfair, and fraudulent practices . . . .

The great bulk of the produce handled by the wholesaler is highly perishable. It may leave the original dealer or producer in perfect form, and yet, on account of conditions over which they have no control, the produce may deteriorate or become absolutely worthless, or it may become the subject of fraudulent manipulation, and no proper record may be available as to the cause of such total or partial deterioration, destruction, or manipulation.

*Id.* at 651–53. Reading the statute to allow a party to waive provisions in § 100.01 by contract would undermine the legislative scheme and the private and public interests it was designed to serve. *See Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 704 (1945) ("It has been held in this and other courts that a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy.").

¶ 26. Heartland's final argument as to why WIS. STAT. § 100.01 does not apply is that the legislature did not intend to cover transactions in which both parties are large sophisticated business entities and, here, Central Farms and Heartland are both large sophisticated businesses. Thus, Heartland argues, the statute's application depends on the level of sophistication of the parties in a given case. We disagree. Nothing in § 100.01

suggests that the legislature intended the statute's applicability to rise or fall on the relative sophistication of the parties. Moreover, Heartland fails to provide a workable definition of "sophisticated" and, therefore, fails to provide a means of determining whether Central Farms, or any other party, is "sophisticated."

¶ 27. Thus, we conclude that the parties' contract was subject to WIS. STAT. § 100.01, including its double damages provision.

## B. Costs And Attorney's Fees Under WIS. STAT. § 100.03

¶ 28. Central Farms argues that the circuit court erred when it ruled that Central Farms was not entitled to costs and attorney's fees under WIS. STAT. § 100.03(20).[14] Again, we are presented with an issue of statutory interpretation, a question of law for our *de novo* review. *See General Cas.*, 258 Wis. 2d 196, ¶ 4.

¶ 29. WISCONSIN STAT. § 100.03 contains numerous regulatory provisions related to the procurement of vegetables. Section 100.03(20) provides a mechanism for enforcement:

> PRIVATE REMEDY. In addition to any other remedy, if a producer sustains a monetary loss as a result of a violation of this section by a contractor, including a failure by the contractor to pay a liability to a producer when due, the producer may bring an action and may recover the amount of the producer's proven damages, together with costs, including all reasonable attorney fees, notwithstanding s. 814.04(1).

For reasons we discuss in the paragraphs that follow, we conclude that Central Farms is not entitled to recover

---

[14] The legislature repealed WIS. STAT. § 100.03, effective February 1, 2002. *See* 2001 Wis. Act 16, §§ 2404 and 9404(2).

costs and attorney's fees under § 100.03. Simply put, Central Farms has failed to convince us that it sustained a monetary loss "as a result of" a violation of § 100.03.[15]

¶ 30. Central Farms asserts that it incurred monetary losses as a result of Heartland violating three provisions of WIS. STAT. § 100.03: the registration requirement, the payment requirement, and the grading requirement. We address each below.

¶ 31. *Registration requirement.* WISCONSIN STAT. § 100.03(2) provides:

> **(2)** REGISTRATION CERTIFICATE. (a) *Requirement.* No contractor may enter into a procurement contract with a producer unless the contractor holds a registration certificate from the department.

Central Farms argues that it is undisputed that Heartland was required to, but did not, obtain a registration certificate. Central Farms, however, simply asserts that Heartland's failure to comply with the registration requirement caused a monetary loss; it does not explain how the violation caused a monetary loss. Consequently, we address this argument no further.

¶ 32. *Payment requirement.* WISCONSIN STAT. § 100.03(6)(b)2. provides:

> **(6)** PAYMENT TO PRODUCERS . . . .
>
> (b) *Payments; when due* . . . .
>
> 2. If a procurement contract specifies a payment

---

[15] Thus, we need not address other issues that the application of WIS. STAT. § 100.03 might present. In particular, we need not address Heartland's argument in its cross-appeal that Heartland was entitled to have the jury determine whether Central Farms was a "producer" under the statute.

801

date in writing, payment shall be made by the specified date. No contract may specify a payment date in violation of subd. 3. or 4.

Central Farms argues that Heartland violated this payment requirement when Heartland failed to make payments in the time frame set forth in an "addendum" to the contract. Without citation to the record, Central Farms asserts that the "parties agreed to the payment schedule" in the "addendum." We are not persuaded, however, that the "addendum" was a part of the parties' contract.

¶ 33. The contract provides that payment is due "15 days following accepted shipment . . . by third party buyer(s) of Heartland." Thus, the contract contains no specific payment date, but rather ties payment to shipment to and acceptance by third parties. The "addendum" is an unsigned one-page document, titled *"ESTIMATED 2000 SNOWDEN CONTRACT PROCEEDS,"* dated November 14, 2000, almost eight months after execution of the contract. It contains a "Payment Schedule," but nothing in the "addendum" suggests that the scheduled dates are more than the document title suggests—estimated payment dates. Certainly nothing in the "addendum" suggests that these dates were meant to supplant the "accepted shipment" payment provision in the contract.[16]

¶ 34. *Grading requirement.* WISCONSIN STAT. § 100.03(15) provides:

---

[16] At oral argument, Central Farms seemed to assert that Heartland committed a payment violation under WIS. STAT. § 100.03(6)(a). But this assertion was not developed at argument, it does not appear in Central Farms' briefing, and Heartland has not had a meaningful opportunity to respond. Accordingly, we decline to address § 100.03(6)(a).

**(15)** VEGETABLE GRADING AND TARE. (a) *Grading procedures and grade standards.* If under a procurement contract the amount received by the producer depends on the grade of the vegetables, the vegetables shall be graded in compliance with all of the following:

1. Standard procedures established by the department by rule.

2. Uniform grade standards established by the department by rule, unless alternative grade standards are clearly specified in writing in the procurement contract. Grade standards adopted by the department shall conform to grade standards adopted by the federal department of agriculture under 7 USC 1621 et seq.

Central Farms argues that Heartland violated this grading requirement because it failed to engage in grading to determine whether the potatoes met the U.S. No. 1 standard specified in the contract. Heartland acknowledges that it did not grade the potatoes in this sense, but instead inspected or tested the potatoes using other standards.

¶ 35. At oral argument, we pressed Central Farms' counsel as to how Heartland's failure to determine whether the potatoes met the U.S. No. 1 standard caused Central Farms a monetary loss. As we understand it, Central Farms' argument is based on two alternatives. First, if Heartland had graded the potatoes when it received them and found they *did meet* the U.S. No. 1 standard, Heartland would not have rejected the potatoes and Central Farms would not have incurred the expenses of this litigation. In the alternative, if Heartland had graded the potatoes, determined they *did not meet* the standard and rejected them immediately, and therefore reasonably, Central Farms could have attempted to sell the potatoes to someone else; late

803

rejection of non-conforming potatoes was unreasonable. We reject both alternatives.

¶ 36. The first alternative assumes that *litigation expenses* may constitute a "monetary loss" under WIS. STAT. § 100.03(20). But that assumption is based on faulty reasoning. Central Farms is saying that an award of litigation costs and attorney's fees may be based on incurring those very same costs and fees. We disagree. Section 100.03(20) provides that a producer may recover costs and attorney's fees "if a producer sustains a monetary loss as a result of a violation of this section." If litigation expenses incurred to prove a violation of § 100.03 were a "monetary loss" for purposes of § 100.03(20), then a "monetary loss" would result any time an alleged violation is successfully litigated. Under Central Farms' reasoning, there would be no reason for the legislature to include an "as a result of a violation" requirement in the statute because *all* proven violations of § 100.03 would entitle the producer to costs and attorney's fees.

¶ 37. Central Farms' second alternative is inconsistent with Central Farms' own theory of the case, that is, that its potatoes *were* of sufficient quality under the contract and Heartland breached the contract by rejecting the potatoes. Stated differently, it was Central Farms' theory at trial that Heartland had no reason to reject the potatoes because the potatoes conformed to the contract requirements. We find no place in closing argument where Central Farms' counsel argued that, even if Central Farms' potatoes did not meet the contract specifications, Heartland's rejection was still unreasonable because Heartland waited too long to reject the potatoes. Thus, we have no basis to assume the factual underpinning of this alternative—that Central Farms' potatoes did not meet the contract standard.

804

¶ 38. Thus, Central Farms has failed to show how Heartland's grading failure resulted in a monetary loss to Central Farms. More generally, for all of the reasons above, we reject Central Farms' assertion that the circuit court erred when it denied Central Farms' request for costs and attorney's fees under WIS. STAT. § 100.03.

## C. Statutory Interest

¶ 39. After verdict, Heartland moved the circuit court to stay execution of the judgment, pending appeal, and toll 12% interest under WIS. STAT. §§ 814.04(4) and 815.05(8). Section 814.04(4) provides for 12% annual interest on money judgments from the time of verdict until judgment is entered. Section 815.05(8) provides for 12% annual interest from entry of judgment until the judgment is paid.[17]

¶ 40. The circuit court granted Heartland's request and ordered that execution of the judgment be stayed. The court further ordered Heartland to pay to the office of the clerk of court the amount of the judgment with statutory interest to the date of payment to the clerk. The court ordered that statutory interest would terminate on the date of payment, and directed

---

[17] WISCONSIN STAT. § 814.04(4) provides:

INTEREST ON VERDICT. Except as provided in s. 807.01(4), if the judgment is for the recovery of money, interest at the rate of 12% per year from the time of verdict, decision or report until judgment is entered shall be computed by the clerk and added to the costs.

WISCONSIN STAT. § 815.05(8) provides:

Except as provided in s. 807.01(4), every execution upon a judgment for the recovery of money shall direct the collection of interest at the rate of 12% per year on the amount recovered from the date of the entry of the judgment until it is paid.

805

the clerk to invest the money in bank accounts to accrue interest pending the result on appeal. As a result of the order, Heartland paid the amount of the judgment, plus accrued statutory interest, to the clerk, but was no longer obligated to pay 12% interest on the judgment amount not yet paid to Central Farms.

¶ 41. Central Farms argues that it is entitled to 12% statutory interest until it receives payment. Central Farms asserts that the circuit court needed to apply the multi-factor test set forth in *Scullion v. Wisconsin Power & Light Co.*, 2000 WI App 120, 237 Wis. 2d 498, 614 N.W.2d 565, to Heartland's stay motion and that consideration of the *Scullion* factors was not possible because the court did not have sufficient information. For example, under *Scullion*, a circuit court must consider the likelihood of success on appeal. *Id.*, ¶ 18. Central Farms contends that this was not possible because the circuit court was not told what the appellate issues would be. Therefore, according to Central Farms, the circuit court could not have properly exercised its discretion to grant a stay and permit payment to the clerk, tolling 12% interest.

¶ 42. Heartland responds that this statutory interest dispute is controlled by *Downey, Inc. v. Bradley Center Corp.*, 188 Wis. 2d 435, 524 N.W.2d 915 (Ct. App. 1994). In *Downey*, we addressed "whether paying the judgment to the clerk of court tolls accrual of postjudgment interest" under Wis. Stat. § 815.05(8). *Downey*, 188 Wis. 2d at 438, 448–49. We answered that question yes, using the following analysis. The statute requires that 12% interest be paid on a judgment " 'from the date of the entry thereof *until paid.*' " *Id.* at 449. "[U]ntil paid" refers to payment by the losing party, not payment to the prevailing party. *Id.* We stated: "Once the

money has been paid into the court, the payor has surrendered the funds and no longer has the use of the money," thereby satisfying "[o]ne purpose of the post-judgment interest statute," that one purpose being "to motivate the debtor to pay." *Id.*[18]

¶ 43. Heartland argues that, under *Downey*, the only pertinent fact here is that the order permitted Heartland to pay the judgment to the clerk of court. Under *Downey*'s reasoning, this is the only fact we need to know because payment to the clerk of court, by itself, satisfies the statutory "until paid" requirement. Central Farms does not respond in any manner to Heartland's assertion that *Downey* is controlling. We take the absence of a reply as a concession, *see Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994) (arguments ignored may be deemed conceded), and, therefore, affirm the circuit court's stay order. Still, we make some observations before leaving this topic.

¶ 44. *Downey* predates *Scullion* and, more importantly, predates the supreme court's decision in *Weber v. White*, 2004 WI 63, 272 Wis. 2d 121, 681 N.W.2d 137. In *Weber*, the supreme court addressed whether a circuit court properly exercised its discretion when it denied a losing party's request for permission to pay the clerk of court a portion of the judgment in order to avoid paying 12% statutory interest pending appeal. *Id.*, ¶¶ 14, 33. The *Weber* court applied the *Scullion* multi-factor test and concluded that the circuit court properly exercised

---

[18] In responding to Central Farms' reliance on *Scullion v. Wisconsin Power & Light Co.*, 2000 WI App 120, 237 Wis. 2d 498, 614 N.W.2d 565, Heartland inaccurately asserts that "[i]n the present case there is not a stay of the enforcement of a judgment being sought, there is simply the tolling of interest issue." That is not true. The circuit court's order plainly states: "[I]t is ordered that execution is stayed . . . ."

its discretion in denying the request. *Weber*, 272 Wis. 2d 121, ¶¶ 35–40. Although *Weber* does not mention *Downey*, at least some aspects of *Weber* suggest that it silently overruled *Downey*. It seems illogical that a circuit court may exercise its discretion to allow a party to pay a judgment to a clerk of court, thereby automatically satisfying the "until paid" requirement in Wis. Stat. § 815.05(8) and ending the inquiry, but, if a court denies such a request, it must assess the matter using the *Scullion* factors, which include the harm to the prevailing party that "may result if the judgment is not paid until completion of an unsuccessful appeal." *Weber*, 272 Wis. 2d 121, ¶ 35. It makes no apparent sense that harm to a prevailing party need not be considered under *Downey* but must be considered under *Weber*. We also note that the *Downey* court considered "[o]ne purpose" of the statutory scheme, "to motivate the debtor to pay," *Downey*, 188 Wis. 2d at 449, but not other apparent purposes recognized in *Scullion* and *Weber*, such as harm to the prevailing party. On the other hand, *Weber* does not discuss *Downey*, and there may be arguments reconciling the two cases. In the absence of briefing, we choose not to attempt such a reconciliation. Finally, we note that it is far from apparent that Central Farms would prevail even under *Scullion* and *Weber*. Central Farms' argument that the record was insufficient for the court to exercise its discretion under *Scullion* is not well developed and, without independent review by this court, is not a winning argument.[19]

---

[19] For example, Central Farms asserts that the circuit court needed an evidentiary record in order to know which issues Heartland would raise on appeal. But the issues Heartland raises on appeal all appear to be issues that Heartland raised below. It is not apparent why the circuit court could not assume

### D. Alleged Trial Errors And Interest Of Justice

¶ 45. In its cross-appeal, Heartland argues that it is entitled to a new trial because of trial errors and in the interest of justice. We address and reject each of its arguments below.

¶ 46. *Testimony of Dr. Wilbur Gould.* Heartland contends that the circuit court erred by permitting a Central Farms expert, Dr. Wilbur Gould, to give a series of answers regarding industry practices and the meaning of terms in the parties' contract. Heartland complains that Dr. Gould's testimony contained improper and unfairly prejudicial legal opinions and speculation. But we discern no reason to think that the challenged testimony, even if erroneously admitted, affected the verdict. *See Martindale v. Ripp*, 2001 WI 113, ¶ 30, 246 Wis. 2d 67, 629 N.W.2d 698 ("If the error did not affect the substantial rights of the party, the error is considered harmless."). Representative is Heartland's complaint about Dr. Gould's testimony that, according to industry practice, after Central Farms delivered the potatoes to Heartland, Heartland was responsible for the potatoes. This is neither a legal opinion about a contract term nor factual speculation and, in any event, our review of the record gives us no reason to think that Dr. Gould's testimony affected the verdict.

that Heartland would raise the same issues on appeal. In addition, although it is true that *Scullion* involved an evidentiary hearing specifically addressing the stay issue, the *Scullion* court did not hold that taking additional evidence is always required. *See Scullion*, 237 Wis. 2d 498, ¶ 6. Also, Central Farms does not discuss whether we must remand, or if we may independently review the record to determine whether it provides a basis for the circuit court's exercise of discretion in staying execution of the judgment.

¶ 47. *Testimony of Steve Diercks.* Heartland contends that the circuit court erred by permitting a Central Farms expert, Steve Diercks, to state his opinion that Central Farms' potatoes were 85% U.S. No. 1, even though Diercks had not personally performed the full battery of USDA tests. This argument is without merit. Diercks testified that he had been working with the U.S. No. 1 grading standard since 1970, had personally graded potatoes to that standard in the past, and had supervised grading crews testing for the standard. Diercks essentially opined that the tests he performed on Central Farms' potatoes were sufficient to provide a basis for his opinion regarding the potatoes' USDA grade. Heartland asks us to assume as a fact that an expert can only render an opinion on USDA grades after applying all USDA procedures. But Heartland does not point to any evidence, much less undisputed evidence, that such is necessary. Diercks' opinion was supported by an adequate foundation, namely, Diercks' own testimony about his expertise in USDA testing procedures and his implicit assertion that his testing was a sufficient basis for his opinion. *See James v. Heintz,* 165 Wis. 2d 572, 579, 478 N.W.2d 31 (Ct. App. 1991) ("A witness called to give expert testimony may, like any other witness, establish a proper testimonial foundation by his or her own testimony."). Heartland was free to attack the basis of Diercks' opinion on cross-examination, which it did, and to present its own expert testimony explaining why Diercks' inspection was inadequate, which it did not.

¶ 48. *Evidence of Heartland employees' income.* Heartland argues that it was error to permit Central Farms to introduce evidence of the incomes of

Heartland's employees, and error to permit comment on those incomes during closing arguments. In Heartland's view, the income evidence was presented to show that "Heartland people have lots of money, the [Central Farms] people have less, and that it was okay to give away Heartland's money freely." We disagree with Heartland's characterization of the record. Our review of the closing argument of Central Farms' counsel reveals that he highlighted the income that certain witnesses received from Heartland to show their economic interest in Heartland. Further, the only statement by Central Farms' counsel that arguably had, as its primary purpose, an appeal to improper bias was counsel's comment that a "powerful corporation like Heartland is in some ways like a river." We decline to order a new trial based on this single comment because there is no possibility it affected the verdict.

¶ 49. *Interest of justice.* Finally, we reject Heartland's assertion that it should receive a new trial in the interest of justice. This assertion is based wholly on the claims of trial error we address above and, therefore, adds nothing to arguments we have already rejected.

## *Conclusion*

¶ 50. In sum, we agree with Central Farms that it is entitled to double damages. We therefore reverse the circuit court's judgment with respect to that issue and remand with directions that the court double the damages portion of the judgment. In all other respects, we affirm the circuit court's judgment, and we also affirm the court's order staying execution of the judgment pending appeal, including the tolling of statutory interest.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions; order affirmed.